Filed 12/18/20  In re Andre P. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re ANDRE P. et al., Persons Coming Under Juvenile Court Law. | B304284 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK95279A-B) |
| Plaintiff and Respondent, | |
| v. | |
| ANDRE P., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Martha A. Matthews, Judge.  Conditionally reversed with directions.

Elizabeth Klippi, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

At the request of the Los Angeles County Department of Children and Family Services (DCFS), minors Andre (born August 2012) and Donte (born May 2014) were removed from their parents Andre P. (Father) and Carmela M. (Mother) in August 2017 and detained in foster care.[1]  In May 2019, at the 18-month review hearing, the juvenile court terminated family reunification services for Father, and in February 2020, at the permanency planning hearing, terminated both Father's and Mother's parental rights and set a permanent plan of adoption, finding inapplicable the beneficial parental bond exception articulated in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[2]  On appeal, Father contends the court erred by:  (1) terminating his family

_____

[1]  Mother's reunification services were terminated in November 2018 at the 12-month review hearing.  She is not a party to this appeal.

[2]  All further statutory references are to the Welfare and Institutions Code.

reunification services in May 2019 despite DCFS's failure to expend reasonable efforts in providing him with services; (2) finding that the beneficial parental bond exception did not apply to his relationship with the children; and (3) impliedly finding that the Indian Child Welfare Act (ICWA) did not apply. DCFS concedes only that the inquiry it made regarding Mother's claimed Indian heritage was insufficient, and that we should order a limited remand for it to conduct a proper inquiry. We conclude the court did not err in finding that DCFS made reasonable efforts to assist Father. Nor did the court err in finding that the beneficial parental bond exception did not apply. We agree that DCFS's ICWA inquiries were inadequate. We therefore effect a limited remand for DCFS to address such defects.

## STATEMENT OF RELEVANT FACTS

### A. *Prior Dependency Case*

In 2012, DCFS filed a "non-detained" petition, alleging that Mother's history of mental and emotional problems, coupled with her refusal to accept treatment and medication, rendered her unable to care for Andre. Father was non-offending. Mother filed an ICWA-020 form claiming Cherokee Indian ancestry and Father filed an ICWA-020 form claiming both Cherokee Indian and Apache Indian ancestry.

In the October 2012 jurisdiction/disposition report, DCFS noted Mother was unable to state whether her family

3

had ever registered with a tribe, and could not explain why she thought she had Cherokee heritage. DCFS asked whether they could interview Mother's mother, and was informed she was intellectually disabled, and required more care than Mother herself did. Mother stated there were no other family members that could be contacted about her Indian heritage. The record is silent as to whether DCFS spoke with Mother's mother. Father also stated he had limited information about any Indian heritage; both his parents were deceased, and no other family members would have any information. Father denied being enrolled in a tribe. DCFS mailed ICWA-030 notices to the Eastern Band of Cherokee Indians, the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee Indians, the Department of the Interior, and the Bureau of Indian Affairs. The Department of the Interior responded, directing DCFS to notify the relevant tribe directly. The Cherokee Nation of Oklahoma responded that it did not consider Andre an Indian child based on the information provided. The record discloses no responses from either the Eastern Band of Cherokee Indians or the United Keetoowah Band of Cherokee Indians.

In November 2012, the court found Andre to be a dependent but released him to his parents under DCFS supervision. The court terminated jurisdiction in November 2013. The record is silent as to whether the court ever made any ICWA determinations.

4

## B.    *The Current Petition*

In May 2014, Mother gave birth to Donte.  Three years later, DCFS received a referral for general neglect and emotional abuse.  Law enforcement had responded to the family's home after Mother struck Father, and threw a "package of putty" at him, causing a laceration to the back of his head.  The children were asleep in their bedroom and not involved in the incident, but there had been two prior domestic violence incidents where both parents had been arrested (neither sought to press charges).  This incident resulted in Mother's arrest, but again Father did not want to press charges.  Both children reported they were not abused and had not witnessed any domestic violence.  Mother claimed that the incident was an accident, and that Father had been drunk when it occurred -- she asserted that Father "drinks a lot."  DCFS initially suggested to Father that it could file a non-detained petition, removing the children from Mother and leaving them with him, but when both parents' drug tests came back positive for amphetamines and methamphetamines, DCFS withdrew this offer, removed the children, and filed a petition in August 2017 under section 300, subdivisions (a), (b)(1), and (j), alleging six counts.[3]  The children were placed in foster care.

---

[3]    Counts a-1 and b-4 alleged that Mother and Father had a history of mutual "violent physical altercations" and in July 2017, while the children were home, Mother hit Father in the head with a "package of putty" causing a bleeding laceration, and resulting in Mother's arrest.  Counts b-1 and b-2 alleged that
*(Fn. is continued on the next page.)*

5

Contrary to the ICWA-020 form submitted in the previous dependency case, this time Father submitted an ICWA-020 form stating, "I have no Indian ancestry as far as I know." At the first day of the initial detention hearing, at which Mother was not present, the court "assume[d] ICWA is not applicable," and Father's counsel responded, "it is not, based on the ICWA form." The court then stated, "Father submitted a declaration regarding Indian ancestry. Court finds ICWA is not applicable based on the prior history of the case." The court ordered Father to undergo weekly drug tests, and enroll in anger management and domestic violence counseling.

On the second day of the initial detention hearing, at which Mother appeared, the court noted Mother had indicated her belief that she had "Cherokee background from Oklahoma." Mother stated she had Cherokee heritage on "both sides," and claimed her great-grandmother, who was deceased, had been a member of the tribe.

DCFS's October 2017 jurisdiction/detention report stated it interviewed Mother regarding her Indian heritage,

---

both Mother and Father abused amphetamine, methamphetamine, and cocaine, rendering each incapable of providing regular care to their children. The count also alleged that each parent knew or should have known of the other's substance abuse. Counts b-3 and j-1 alleged Andre was previously a dependent of the juvenile court, and Mother's history of mental and emotional problems, including an intellectual disability, previous hospitalizations for psychiatric issues, and refusals to take prescribed medication, endangered both minors.

but the results of the interview are not in the record.  Nor is there any record of whether DCFS attempted to interview Mother's relatives.  ICWA-030 notices were sent to the Bureau of Indian Affairs, the Department of the Interior, the Cherokee Nation of Oklahoma, the United Keetoowah Band of Cherokee, and the Eastern Band of Cherokee Indians.  The Eastern Band of Cherokee Indians and the United Keetoowah Band of Cherokee responded that based on the information provided, neither Andre nor Donte were Indian children.  The record contains no response from the Cherokee Nation of Oklahoma (though the Nation had responded to a previous inquiry stating that Andre was not an Indian child).  It does not appear that the court ever made an express finding regarding the applicability of ICWA as to Mother.

In November 2017, the court sustained the petition, removed the children from both parents, and kept them in foster care, granting both parents monitored visitation twice a week for a minimum of two hours per visit.  Father was ordered to attend a full drug and alcohol program with aftercare, and submit to random drug testing.  He was also ordered to take parenting and anger management classes.  Father has not challenged either the jurisdictional or the dispositional order.

## C.    *The Six-Month Review Hearing on July 31, 2018*

DCFS's report for the six-month review hearing, and all future reports, indicated ICWA did not apply. Father was assessed as being "moderately compliant" with court orders. He "immediately" enrolled in services once "provided with resources," and by March 2018, he had completed six months of outpatient drug and alcohol treatment. He was also attending educational groups five times a week, and individual counseling once a week. The report noted, however, that after the court's orders in November 2017, he had tested positive for alcohol four times; even after he was reminded that he was to abstain from both drugs and alcohol, he tested positive for alcohol in April 2018.

In the meantime, Andre and Donte had "thrived" in foster care. Father visited them weekly for approximately three hours. The foster father who monitored the visits opined that Father had a supportive and close relationship with the children, but would benefit from setting limits with them. Both Father and the children thought the visits went well, and the children were excited to see Father.

In two last minute informations, Father was reported to have tested positive for alcohol once in mid-May 2018, and three times in June 2018. DCFS noted Father's efforts in securing after-care services for his drug and alcohol treatment, recognized his commitment to his children, and believed that "with the appropriate support services it is likely that [Father] will reunify with his children within the

next six months."  The last minute informations also requested that the court order conjoint counseling, and permit Father unmonitored visits in a therapeutic setting.

The court held the six-month review hearing on July 31, 2018.  It found that Father had made substantial progress toward addressing the causes requiring removal of the children and continued reunification services.  The court also ordered DCFS to commence unmonitored therapeutic visits.  In August 2018, DCFS e-mailed Kandace Brown, a therapist working for ChildNet Youth and Family Services, who had been providing individual therapy to Andre, inquiring about conjoint therapy for Father and the children.  Brown stated she would speak with her supervisor.  DCFS e-mailed Brown again in September as a follow-up, but received no response.

### D.    *The Twelve-Month Review Hearing on October 30, 2018*

DCFS's October 2018 report for the twelve-month review hearing reported that Father still had regular weekly visits with the children, but now noted they were "of low quality."  Father had limited interaction with the children, and spent visits on his phone, or watching the children play.  The report also noted Father "has not complied with the request for conjoint counseling."  He additionally tested positive for alcohol twice in August 2018, and his drug and alcohol counselor reported that he was "not forthcoming in regard to his sobriety and triggers."  DCFS recommended

9

that reunification services continue, and that Father and the children participate in conjoint counseling. The court followed DCFS's recommendation, ordering that Father continue to be provided with reunification services, and also ordering Father to participate in conjoint therapy, which DCFS was to ensure was "set up immediately" as it "should have been set up after the last hearing." The court admonished all parties that if something it ordered did not occur, the parties needed to "call somebody." The court also expressed concern over Father's positive alcohol tests, noting that "alcohol leaves a person's system quite rapidly. So the fact that Father has actually tested positive for alcohol suggests that he does have a somewhat untreated drinking problem." Nevertheless, the court still found a "substantial probability" that Father would reunify with the children, but warned him that the court could provide services only until February 2019, and if he were unable to reunify with the children before then, another permanent plan would be found.[4]

---

[4] The court noted that Mother was not visiting the children and her current whereabouts were unknown. Therefore, it terminated reunification services for Mother, finding no substantial probability that the children would be returned to her within 18 months of their removal.

**E.**	***The 18-Month Review Hearing on May 23, 2019***

The 18-month review hearing was continued several times, finally occurring in May 2019.  The following information was derived from DCFS's reports and filings, as well as Father's testimony and representations at the hearings.

**1.**	***Conjoint Counseling***

From October 2018 to January 2019, DCFS contacted therapist Brown monthly but received no information regarding conjoint counseling.  On January 22, 2019, DCFS discovered that Brown had left ChildNet's employ.  DCFS then worked with Brown's supervisor to identify another therapist to provide conjoint counseling, finding one in early March 2019.

While DCFS was communicating with ChildNet, it also reminded Father in October 2018 that the court had ordered conjoint counseling, and advised him to contact the foster parents to coordinate dates for the sessions.  Father later testified that DCFS had told him the foster parents would tell him where and when to go to conjoint counseling.  Father acknowledged, however, that he never asked the foster parents for the information, despite seeing them weekly when visiting his children.  Nor did he follow up with anyone else regarding conjoint counseling because he "thought they already knew about it."  In January 2019, DCFS asked Father "if he had discussed the conjoint

counseling with the [foster parents] to coordinate their schedules" and Father responded he had not. DCFS also asked whether Father had spoken with the therapist, and Father responded he had not. DCFS "adamantly informed father that this was a court order and necessary for reunification" and "Father confirmed that he understood."

On March 4, 2019, DCFS texted Father and asked him to contact the new therapist. In mid-March, ChildNet told DCFS therapy could begin "next week or the week after," but ChildNet needed to confirm a date and time for the session, and to speak with Father. Despite DCFS's request, Father made no attempt to contact the therapist until March 29. It then took seven days and three calls from ChildNet before they finally spoke on April 5. Conjoint counseling began on April 16, continuing weekly thereafter; Father and the children had attended six sessions by the 18-month review hearing.

### 2. *Father's Visitation with and Knowledge of the Children*

Meanwhile, the children continued to thrive in foster care. Andre, who had been diagnosed as autistic, was receiving services through the Regional Center and had an Individualized Education Program (IEP). Father did not participate in the meeting at which the IEP was developed, and agreed that decisions could be made in his absence. In general, Father had very limited knowledge about his

children, at one point claiming he did not know he could ask questions about them.

Father's visits lessened in duration from three hours to one hour, and he sometimes canceled on the day of the scheduled visit. He did not reschedule canceled visits and did not schedule visits over the holidays. The foster parents noted that when Father did visit, he was minimally involved with the children, spending the time on his cell phone, and deferring discipline of the children to the foster parents. DCFS encouraged Father to assert himself as an authority figure, and suggested activities to do with the children, but while Father was receptive to the feedback, his behavior did not change in subsequent visits. The children were comfortable with Father, and "appear[ed] to be securely bonded."

On February 25, 2019, at one of the previously scheduled 18-month review hearings that the court continued, Father reported he was being provided with only two hours of visitation each week when the court had ordered twice weekly visits, each with a two-hour minimum. The court ordered DCFS "to immediately figure out how to at least provide the court-ordered minimum amount of visitation." However, the court reiterated to Father, "I am making very clear orders today, if you don't get at least four hours per week of visitation, call your attorney and just make it happen, because you want to move step by step towards taking care of your children."

13

After this hearing, Father was informed that he could visit the children for two hours on Mondays and two hours on Thursdays. However, in March, he visited the children a total of three times, once for 90 minutes, and twice for an hour. Starting April 1, 2019, Father was given a written visitation schedule, which provided not only two-hour monitored visits on Mondays and Thursdays, but also two-hour unmonitored visits on Saturday. Father received this schedule and stated he had no questions, but his visits still did not exceed 90 minutes. When asked later how the Saturday visits were going, Father claimed not to know he could visit his children on Saturdays. He had to be prompted by DCFS several times over several days before he contacted the foster parents to arrange for a Saturday visit. His two Saturday visits, which were unmonitored, also lasted only 90 minutes.

DCFS made an unannounced visit on April 29 to a monitored visit and observed that when the children ran around the McDonald's where the visits took place, and jumped on tables, Father made no attempt to control them. But when the foster father told the children to stop, they complied immediately. DCFS witnessed the children going to the foster father to "tattle." It was reported that this was Father's typical behavior when it came to discipline; when asked to explain himself, he claimed to be uncomfortable asserting himself while the foster parents were observing him, because they might give a "bad report" to DCFS, and claim he was "being real mean" to his kids. Father also

claimed he was "unaware that he could parent his children while they were in foster care."

Regarding the fact that he was not using the full two hours of his visits, Father explained that the visits began at 4:00 p.m. in Compton, and he did not want to be in Compton after dark. Sometimes he left before dark, because he thought the foster parents looked tired, but acknowledged they never asked him to end the visits early. He provided no explanation for the abbreviated duration of his Saturday visits.

### 3. *The Hearing*

At the May 23, 2019 hearing, after admitting DCFS's exhibits without objection, the court heard argument from the parties. Father's counsel argued the children should be returned to Father because DCFS had not demonstrated they would be unsafe in his care. With the exception of conjoint counseling, and "a few hiccups here and there," counsel asserted that Father had been in full compliance with the case plan. In regard to conjoint counseling, counsel argued that DCFS had failed to assist Father "as proactively as they should have" and thus did not provide reasonable services. Counsel also pointed out Father had tested negative for drugs and alcohol for the past seven months. Father and his children were mutually bonded and loved each other, and while Father's counsel admitted that Father had not been an active parent during his visits, she blamed this on Father's being a "reserved man" and it being "very

15

difficult for him to show any type of authority in front of foster parents, who he knows are constantly reporting back to the social worker, and he knows are actively looking for ways to . . . essentially adopt these kids." Father's counsel therefore suggested the court could implement a phased plan to transition the children back to his care or, if the court were not inclined to implement this plan just yet, to at least continue the hearing while implementing some portion of the plan. The children's counsel, while acknowledging this was a "close case," joined Father's counsel in asking the court to return the children to Father, with services provided to the family. DCFS's counsel countered that Father had received 21 months of reunification services, and had failed to demonstrate he was a fit parent. He lacked knowledge of important aspects of his children's lives, such as their medical, behavioral, and academic needs. DCFS had been required to continually prod Father to visit his children in an unmonitored setting, his visits never exceeded 90 minutes, and he failed to fully engage with the children during those visits. DCFS's counsel therefore asked the court to terminate reunification services.

The court found that Father had not demonstrated he could safely care for the children on a full-time basis. The court mentioned that in a previous hearing, "it was super clear that it was really important for the father to use all of his visitation time to be able to show that he is capable of keeping these children safe and meeting their needs on a full-time basis. And in spite of that, Father maintained a

16

pattern of visitation where he would show up and then leave after about an hour, and an hour and a half." The court noted it was "not that hard to take care of two small active boys for an hour or an hour and a half at a time" but "super hard to take care of two small active boys 24 hours a day, seven days a week." And while acknowledging that Father loved his children and they loved him, the court observed, "Father's behavior has clearly indicated that he is not in a place to be a full-time parent." The court also specifically found that DCFS had made reasonable efforts in that it "made proactive and good faith efforts to work with the father on this case and has tried to help the father understand that he needs to show proactive behavior. And, at a certain point, the parent also has a responsibility to be proactive." Because the court did not believe that continuing the hearing "would make it any more likely that the father would be able to parent these children full-time" and "would just be delaying permanency," the court terminated family reunification services, and set a hearing under section 366.26. The court did not advise Father of the requirement to file an extraordinary writ to challenge this order, and Father did not do so.

F.    *Section 366.26 Hearing on February 6, 2020*
When DCFS spoke with the children about the foster parents adopting them, Andre stated he was a little sad, and wanted to return home with Father, but also stated he was happy living with his foster parents and would be happy to

17

do so forever.  Donte stated he was happy to be able to stay with his foster parents.  DCFS informed the court the children were adoptable and had thrived in the care of the foster parents, and the most suitable plan was for them to be adopted by the foster parents.

Through last minute informations, DCFS additionally informed the court that the foster parents wanted Andre to be assessed for psychotropic medication for his autism, but Andre's Regional Center case manager as well as ChildNet had both advised that Andre should first participate in applied behavioral analysis therapy (ABA services).  As of January 16, 2020, the foster parents had not yet initiated ABA services, but a February 6, 2020 report indicated DCFS had assisted them in "locating a service provider for ABA and provided instructions how to transition the youth from his medi-cal plan to a plan accepted by the ABA service providers."

DCFS also informed the court that the foster parents "had been considering not adopting and only accepting Legal Guardianship for the children" but later provided clarification: the foster parents were concerned about their ability to "get services for the children," but after being provided by DCFS with written information about the services available after adoption, they were "committed to adoption."

Finally, DCFS informed the court that the quality and duration of Father's visits had not improved; from August 3, 2019 to January 18, 2020, Father had visited the children 13

18

times, with no visit lasting more than one hour and 45 minutes. The foster father reported that Father watched videos on his phone with the children during the visits, and did not converse with them. Father had also asked DCFS to draft a letter to the housing authority stating that he was still receiving family reunification services and the children would be returning to his custody. When informed that his services had been terminated, Father "was adamant that they were not," and did not understand why they had been. He stated he would lose his housing.

The court held the Section 366.26 hearing on February 6, 2020. The parties stipulated that if called to testify, the children would say they enjoyed their visits with Father (whom they called "'Daddy'") and loved him. The parties further stipulated that if called to testify, Father would state that he had visited the children 15 times since September 29, 2019; that the visits were two hours in duration and took place at a McDonald's; that he asked the children about school; that they called him "'Daddy'"; and that he believed there was a strong bond between the children and him. The court then heard argument. The children's counsel asked the court to terminate parental rights and set a permanent plan of adoption. Father's counsel opposed the termination of parental rights, arguing the beneficial parental bond exception set forth in section 366.26, subdivision (c)(1)(B)(i)

applied.[5]  Father's counsel argued he had had regular
visitation with the children, and the bond between them was
strong enough they would suffer a detriment if his parental
rights were terminated.  The children's counsel countered
that it was only recently that Father's visitation had become
more regular but that in any case, Father did not assume a
parental role during the visits.  Acknowledging that there
was a bond between Father and the children, their counsel
argued it did not outweigh the benefits of permanency and
adoption.  DCFS's counsel agreed with the children's
counsel.

While the court acknowledged more-or-less consistent
visitation by Father, it found he had not demonstrated he
could be an active parent.  The court found by clear and
convincing evidence that "although father has maintained
regular visitation with the children and has established a
bond with the children, any benefit accruing to the children
from their relationship with the father is outweighed by the
physical and emotional benefit that the children would
receive through the permanency and stability of adoption,

---

[5]      "If the court determines, . . . by a clear and convincing
standard, that it is likely the child will be adopted, the court shall
terminate parental rights and order the child placed for adoption
. . . unless . . . [t]he court finds a compelling reason for
determining that termination would be detrimental to the child
[because] . . . [t]he parents have maintained regular visitation
and contact with the child and the child would benefit from
continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

and adoption is in their best interest." The court therefore terminated Father's and Mother's parental rights, set adoption as the permanent plan, and designated the foster parents as the prospective adoptive parents. Father timely appealed.

## DISCUSSION

### A.   *Reasonable Services*

An agency providing reunification services to a parent "must make a good faith effort to provide reasonable services responsive to the unique needs of each family." (*Patricia W. v. Superior Court* (2016) 244 Cal.App.4th 397, 420.) "'[T]he reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding reasonable services were offered or provided, 'the record should show that the supervising agency . . . maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult . . . .'" (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

At the 18-month review hearing, the court found that DCFS had made "reasonable efforts" to assist Father. Father argues this finding was erroneous because conjoint counseling did not commence until April 2019, eight months

after the court ordered it.[6]  We review the court's finding for substantial evidence.  (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 598 (*Katie V.*).)

Father contends "nothing happened" after the court ordered conjoint counseling on July 31, 2018.  But the record demonstrates DCFS continually attempted to arrange for conjoint counseling through the agency providing Andre with individual therapy, and simultaneously encouraged Father to ascertain his children's availability for conjoint therapy.

Specifically, Kandace Brown, a therapist working for ChildNet Youth and Family Services, had been providing individual therapy to Andre.  DCFS e-mailed or phoned Brown at least once a month from August 2018 to January 2019 to ask about conjoint counseling.  Brown never

---

[6]     Because this finding was made in the order setting the Section 366.26 hearing, Father's failure to file an extraordinary writ challenging that order would normally foreclose him from challenging it now.  (See, e.g., *In re Cathina W.* (1998) 68 Cal.App.4th 716, 720 ["An aggrieved party may seek review of the setting order by appeal from the order subsequently made at the section 366.26 hearing, but only if . . . the party filed a timely petition for extraordinary writ review of the setting order"].)  However, Father argues, and DCFS agrees, that in light of the court's failure to advise him of the writ requirement, he may make his challenge in this appeal.  (*In re Athena P.* (2002) 103 Cal.App.4th 617, 625 [when court fails to advise of writ requirement, "in most cases the parent has good cause to be relieved of the requirement.  Thus, even though the parent failed to file a writ petition, he or she can still challenge, on appeal, the order setting a section 366.26 hearing"].)

provided an update, and DCFS discovered on January 22 that Brown had left ChildNet's employ. DCFS then worked with Brown's supervisor to identify another therapist who could provide conjoint counseling, finding one in early March 2019.

While DCFS was communicating with ChildNet, it also reminded Father in October 2018 that the court had ordered conjoint counseling, and requested he contact the foster parents to coordinate dates for the sessions. Father did not do so.[7] After ChildNet identified a new therapist, DCFS texted Father on March 4 and asked him to contact her. In mid-March, ChildNet told DCFS that therapy could begin "next week or the week after," but ChildNet needed to confirm a date and time for the session, and to speak with Father. Father made no attempt to contact the therapist until March 29, and it took another week before they spoke. Counseling began shortly thereafter.

While DCFS might have done more -- for example, by following up with Brown more frequently and insistently before she left ChildNet -- as courts have consistently observed, "in most cases more services might have been provided and the services provided are often imperfect.

---

[7] Father claimed DCFS told him the foster parents would provide details regarding conjoint counseling, but he had no cogent explanation for failing to simply ask them for this information, especially after confirming that he understood the importance of conjoint counseling, and that it was necessary for reunification.

[Citation.] 'The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances.'" (*Katie V.*, *supra,* 130 Cal.App.4th at 598-599.) "[T]he mere fact that more services could have been provided does not render the Department's efforts unreasonable." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973 (*Alvin R.*).)[8] Here, DCFS consistently tried to enroll

_____

[8]      Father's reliance on *T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229 (*T.J.*) and *Alvin R.*, *supra,* 108 Cal.App.4th 962 is unhelpful.  In *T.J.*, the Court of Appeal reversed a juvenile court's finding by clear and convincing evidence that the San Francisco Human Services Agency provided reasonable services when the parent had "mental health and intellectual disability" issues, it took the agency nearly 11 months to provide her with a therapist and almost eight months to provide in-home parenting services, and the agency "failed completely" to provide the parent help with anger management, independent living skills, or housing assistance.  (*T.J.*, *supra,* at 1244, 1248.)  In *Alvin R.*, this court found that the juvenile court erred in finding by clear and convincing evidence that reasonable reunification efforts had been made where DCFS's "only effort" to overcome the "major obstacle" of a harried grandmother's insistence that DCFS find a therapist for the minor in her care near her home "was apparently to make a referral to a therapist who had no time available to see [the minor]." (*Alvin R.*, *supra,* at 973.)  Therapy for the minor was vital because he would refuse to visit his father without it.  (*Ibid.*)

The facts of the instant case are materially different. Preliminarily, because the court made its finding at the 18-month review hearing, it was required to find reasonable efforts by a preponderance of the evidence, not by clear and convincing

*(Fn. is continued on the next page.)*

24

Father in conjoint therapy, but was stymied by an unresponsive therapist and a lackadaisical parent. On this record, we find substantial evidence supports the juvenile court's finding that DCFS expended reasonable efforts in providing Father with the services needed.

## B. *Beneficial Parental Bond Exception*

"If the court determines, . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption . . . unless . . . [t]he court finds a compelling reason for determining that termination would be detrimental to the child [because] . . . [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i).) It is the parent's burden to prove the exception. (*In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1343 ["[I]f there is clear and convincing

---

evidence. (*Katie V.*, *supra*, 130 Cal.App.4th at 598.) Additionally, unlike the mother in *T.J.*, Father does not contend DCFS was deficient in providing any service other than conjoint counseling. Moreover, unlike the agency in *T.J.*, DCFS did not simply refer Father to a therapist for conjoint counseling and leave him to his own devices; it consistently followed up both with the therapist and with Father himself. Nor was visitation an issue as in *Alvin R.* -- the minors visited Father regularly even without conjoint therapy. Finally, there was no evidence that Father lacked ability, time, or resources to expend some effort himself.

25

proof of adoptability, the juvenile court must terminate parental rights unless *the parent* produces evidence sufficient to persuade the court that the child would benefit from continuing the parent-child relationship"].)

Here, the court found by clear and convincing evidence that "although father has maintained regular visitation with the children and has established a bond with the children, any benefit accruing to the children from their relationship with the father is outweighed by the physical and emotional benefit that the children would receive through the permanency and stability of adoption, and adoption is in their best interest." The court therefore terminated Father's parental rights. We review the court's determination "whether the existence of [the parental] relationship . . . constitutes 'a compelling reason for determining that termination would be detrimental to the child'" for an abuse of discretion. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.)

Father does not contend the court erred in its factual findings regarding his relationship with the children. Instead, he argues the court abused its discretion in finding that terminating that relationship would not be detrimental to the children. Specifically, he argues that the foster parents were "ambivalent" toward adoption; the foster parents had initially declined ABA therapy for Andre; the children were bonded to Father; and the delay in the

26

commencement of his conjoint counseling warranted a "lesser permanent plan."[9] We are not persuaded.

### 1. *Foster Parents*

The foster parents were not "ambivalent" toward adoption. The record shows that the foster parents had concerns regarding their ability to obtain services for the children should they adopt them, but once DCFS provided them with information about the services available after adoption, they were committed to adopting the children.

Regarding ABA therapy, while the foster parents were initially in disagreement with such treatment, on February 6, 2020, DCFS submitted a last minute information indicating that it had assisted the foster parents with "locating a service provider for ABA and provided instructions how to transition the youth from his medi-cal plan to a plan accepted by the ABA service providers."

### 2. *Parental Bond*

While the parties agree Father and the children loved each other, "[e]vidence of 'frequent and loving contact' is not sufficient to establish the existence of a beneficial parental relationship." (*In re Bailey J.* (2010) 189 Cal.App.4th 1308,

---

[9] Father also argued "to the extent the court took into consideration the fact that appellant's visitation was only at the supervised stage, the law is clear—a parent should not be penalized because they are only participating in supervised visitation . . . ." We see no evidence that the court "penalized" Father because he was still having monitored visits.

1315-1316 (*Bailey J.*).) Courts have consistently interpreted the beneficial parental bond exception to apply only to those parent-child relationships the severance of which "would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed . . . ." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "[I]t is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350.)

Moreover, "for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 468.) Here, the evidence was that Father's relationship with the children was more avuncular than parental. Father had little knowledge of his children's medical, behavioral, and academic needs or progress, and never asked the foster parents about them. He did not participate in Andre's educational decisions, instead leaving others to make them. Father did not even use all of his visitation time with the children, and in the time he did spend with them, he failed to assume a parental role. Father's relationship was more like that of a "friendly nonparent relative" than a parent.

### 3. *Delay of Conjoint Counseling*

Finally, while the commencement of conjoint counseling was delayed for many reasons -- including father's own inaction -- "'[t]he factors to be considered when looking for whether a relationship is important and beneficial are: (1) the age of the child, (2) the portion of the child's life spent in the parent's custody, (3) the positive or negative effect of interaction between the parent and the child, and (4) the child's particular needs.'" (*Bailey J.*, *supra*, 189 Cal.App.4th at 1315.) Whether Father promptly received the therapy ordered does not factor into the court's decision.

Father incorrectly contends that *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.*) and *In re E.T.* (2018) 31 Cal.App.5th 68 (*E.T.*) compel a contrary result. In *Amber M.*, "[a] psychologist who conducted a two-hour bonding study of Mother and Amber concluded that they shared . . . a 'primary maternal relationship,'" which could be detrimental to sever. (*Amber M.*, *supra*, 103 Cal.App.4th at 689.) The court also found that "Mother visited as often as she was allowed and acted in a loving, parental role with the children when permitted visitation." (*Id.* at 690.) By contrast, as discussed above, the children's relationship with Father was closer to that of a family friend or uncle, not a parent. Moreover, Father consistently underused his visitation time with the children, both in frequency and duration.

Similarly, in *E.T.*, the mother provided comfort and affection to the children during the visits, and addressed

29

their fears and anxieties.  (*E.T.*, *supra*, 31 Cal.App.5th at 72.)  The court found that, over time, Mother "became more reflective and was better able to handle disagreements with the children or their misbehavior."  (*Id.* at 76.)  In contrast, Father's visits consisted mostly of watching videos with his children and, when they misbehaved, looking to the foster parents to discipline them, even when he had been told repeatedly he needed to assert himself and demonstrate parental behavior.

"A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd.  The appropriate test is whether the court exceeded the bounds of reason."  (*In re L.W.* (2019) 32 Cal.App.5th 840, 851, citing *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)  On this record, the court did not exceed the bounds of reason in declining to find that termination of the parental relationship in favor of adoption would be detrimental to the children.

### C.   *ICWA*

Father contends DCFS failed to interview some of Mother's extended family about her potential Indian heritage.  He also notes several deficiencies in the ICWA-030 notices provided to the Indian tribes.  Father therefore asks us to remand and order DCFS to conduct a proper inquiry into Mother's potential Indian heritage.  DCFS concedes it failed to fully comply with the requirements of ICWA, and agrees we should "order a limited remand to the juvenile

30

court for the purpose of DCFS conducting proper inquiry and notice under the ICWA as to mother." We agree.[10]

---

[10] We decline Father's request to order further inquiry into his potential Indian heritage due to a "conflict" between the ICWA-020 form filed in the previous dependency case and the one filed in this case. In 2012, when asked about potential Indian heritage, Father had no useful information, representing that both his parents were deceased, and that no other family members would have any relevant information. In 2017, he filed an ICWA-020 form claiming he had no Indian heritage -- a representation confirmed in court by his counsel. Father has not argued the court was obliged to inquire further on this record, nor has he suggested any factual basis for opening a new inquiry.

## DISPOSITION

The court's February 6, 2020 order is conditionally reversed. The matter is remanded to the juvenile court with directions to order DCFS to inquire into Mother's potential Indian heritage and, if relevant information not contained in previous notices sent in this case is discovered, send out new notices to the relevant tribes in accordance with ICWA and California law. DCFS shall thereafter inform the juvenile court of its findings and actions, and the court shall hold a hearing to determine whether the ICWA inquiry and notice requirements have been satisfied and whether the children are Indian children. If the court finds they are Indian children, it shall proceed in conformity with ICWA and related California law. If the court finds they are not Indian children, the court's February 6, 2020 order shall be reinstated. Father shall be notified of all hearings related to this remand, and shall have the right to appear and be represented by counsel.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, P. J.

We concur:

WILLHITE, J.                                    COLLINS, J.

32